IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Robin L. Knight,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 09 C 6577 |
| **Ron Kerstein, et al.,** | ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

Defendants DuPage County Sheriff's Deputies Ron Kerstein, Gary Naydenoff, David Hakim, and Mark Asmussen (collectively, "Deputies" or "defendants") seek summary judgment on plaintiff Robin Knight's second Amended Complaint at Law ("Amended Complaint" or "Complaint"). The Amended Complaint alleges three claims under 42 U.S.C. § 1983: 1) excessive force; 2) failure to intervene; and 3) false detention. Plaintiff also seeks punitive damages, which defendants also challenge in this motion for summary judgment. For the following reasons, I deny the motion in part and grant it in part.

I.

Many of the facts in this case are disputed. The parties agree that, on the morning of October 18, 2007, DuPage County Sheriff's Deputies, including defendants, and Lisle, Illinois

Police Officers were searching for Tammy Unak-Murray, a reportedly suicidal and missing person thought to be in or near the "Four Lakes" area of unincorporated Lisle, Illinois. Defendants received a "Missing Suicidal" flyer that included a low-quality picture of the missing woman and a description of her physical and mental state. Unak-Murray was described in the flyer as female, white, thirty-seven years of age, weighing 128 pounds, height of 5' 04", "shoulder length blonde hair," and green eyes. She had last been seen wearing a gray sweater and dark corduroy pants. The flyer also indicated that Unak-Murray was "bi-polar on medication" and "known to carry razor blades in her socks."[1] Though the photo on the flyer was of a poor quality, defendants state a Lisle Police Officer who was familiar with Unak-Murray was available to identify her.

That same morning, Knight was walking on Four Lakes Avenue in the "Four Lakes" area of Lisle. At the time, Knight, who is female and white, was forty-four years of age, weighed 125-130 pounds, was approximately 5' 04 1/2", and had "dark blondish" hair and "hazel" eyes. On the morning in question, Knight was

---

[1] Plaintiff disputes defendants' characterization of Unak-Murray as a danger to others. Knight points out that while defendants state that Unak-Murray "injured an Emergency Medical Technician with a razor blade when said EMT attempted to transport her to a hospital," according to the police report documenting the incident, the EMT was injured by the hidden razor blade while transporting the then-unconscious Unak-Murray. Further, it is unclear whether the Deputies knew about the incident with the EMT at the time of the incident.

wearing "gray pants" and a "black windbreaker." Knight was on her way to a near-by convenience store ("the pantry") for coffee before going to a job interview. Kerstein and Naydenoff spotted Knight while they were driving in the area in an unmarked Sheriff's Department vehicle. The two Deputies approached Knight and Naydenoff, dressed in casual clothes, got out of the vehicle and attempted to engage Knight.

At this point, the parties' version of the ensuing encounters diverge. Knight testified in her deposition that the vehicle almost blocked her path and Naydenoff quickly jumped out and engaged her without identifying himself, though Knight also indicated in her testimony that at some point she became aware that the defendants were in fact law enforcement officers. Defendants counter that Naydenoff did in fact identify himself and also that he attempted to explain his purpose in stopping Knight. Both parties agree, though, that Naydenoff showed Knight the picture of Unak-Murray on the flyer, and asked if Knight knew or recognized the woman. Knight told Naydenoff that she did not recognize the woman in the picture and could not help any further. Knight also told Naydenoff that she had a job interview that morning and wanted to be on her way to the pantry for her coffee. Knight disengaged and continued on her walk.

The parties disagree as to whether or not Naydenoff and Kerstein requested that Knight identify herself, with defendants

claiming they did request identification and plaintiff claiming they did not.[2] The parties also disagree on the point of Knight's behavior. Knight claims that she simply ended the conversation with Naydenoff, but the defendants contend that Knight responded to Naydenoff's attempt to engage her "by continually swearing at him" and "yelling at him to leave her alone."

In either case, it is undisputed that Naydenoff and Kerstein continued to follow Knight in their car. One of the Deputies then got out of the car and began following Knight on foot. The Deputy addressed Knight as "Tammy," calling out the name as he followed her. According to Knight, she explained to the Deputy that her identification was at home but that the employees at the pantry would be able to identify her. The Deputies did not take Knight up on her offer, and claim that Knight continued to yell and swear at them. According to defendants, Kerstein communicated the situation to the command post, and additional officers were dispatched, including the Lisle police officer who would be able to identify Unak-Murray.

---

[2] At one point during Knight's deposition, she claimed that neither Naydenoff nor Kerstein asked for her name. Defendants point to another moment during the deposition when Knight testified that the Deputies asked whether or not she was carrying identification. These statements do not necessarily contradict one another and do not give me a reason to discount Knight's version of events at present.

4

Defendants state that Hakim and Asmussen heard the radio call indicating that it was believed Unak-Murray had been sighted, and drove to the area of the pantry. Hakim and Asmussen observed Knight either running or walking toward the pantry, and they decided to block the entrance to the store. The Deputies stopped their vehicle in front of the entrance, and got out of the vehicle to block Knight's path. The Deputies were, again, in an unmarked vehicle and were wearing casual clothes, though Knight observed that Hakim was wearing his badge on his belt. Again, the parties dispute whether or not the Deputies identified themselves to Knight, with Knight stating that they did not and defendants claiming that they did.

Knight continued her attempt to get past the Deputies and into the pantry. She claims that one of the Deputies was still yelling "Tammy," and she testified that she told Hakim or Asmussen that she needed to get into the convenience store to get "an identification." Defendants have testified that she approached Hakim and Asmussen yelling obscenities and saying that she didn't have to talk and had a "medical condition." Knight attempted to enter the pantry, but Hakim stopped her from doing so. According to defendants, she tried to kick Hakim and possibly Asmussen as well. Knight claims that she did not attempt to kick any of the defendants.

5

Whether or not Knight kicked or attempted to kick any of the defendants, the parties agree that before Knight could enter the store, Hakim and Asmussen physically took hold of Knight by her arms and legs and brought her down to the ground. Knight testified that at this point she was yelling for an employee who she believed was working in the convenience store and then yelled "I am not Tammy. I told you I am not Tammy. My name is Robin." Defendants testified that Knight yelled at them to leave her alone and that she was also yelling obscenities.

Knight's version of how Hakim and Asmussen brought her down onto the ground differs from defendants' version. Defendants recount only one instance of physical contact: That after Knight attempted to kick them, they controlled her actions and brought her to the ground. According to defendants, the Deputies restrained Knight less than a minute before the Lisle police officer arrived and confirmed that she was not Unak-Murray. According to Knight, Hakim grabbed her, pushed her behind him, and then let her go. Shortly after, one of the Deputies grabbed her arms behind her back and someone then kicked her knee out from behind, causing her to fall. After she fell to the ground, Hakim grabbed her ankles, flipped her onto her back, and eventually manipulated her legs against her torso. As to the latter action, Knight claims that Hakim pushed her legs down and twisted them like a pretzel by crossing her right leg over her

6

left at the knee. Further, Knight says that she was screaming that Hakim was hurting her neck and back and also informed him that she had health problems. Knight testified that she believes the time that elapsed from the moment Hakim initially grabbed her to when he released her was more than ten but less than fifteen minutes. Knight admits that she was released quickly after the Lisle police officer confirmed that she was not, in fact, Unak-Murray.

II.

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party may not "resist

the motion and withstand summary judgment by merely resting on its pleadings." *Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 628 (7th Cir. 2006). Rather, the non-movant must show there is a genuinely disputed fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). I must construe all facts in the light most favorable to the non-moving party and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255 (citations omitted).

A.  Count I – Excessive Force and Failure to Intervene

   The Deputies argue that they are entitled to summary judgment on Knight's claim of excessive force and failure to intervene because there was no constitutional violation where the amount of force used was reasonable. Specifically, they argue, first, that Hakim and Asmussen justifiably restrained Knight's movements by placing and holding her on the ground, and, second, that Kerstein, Naydenoff, and Asmussen did not have any reason to intervene when Hakim made physical contact with Knight. In the alternative, defendants argue that they are entitled to qualified immunity.

   In considering whether the Deputies violated Knight's constitutional right, I analyze whether excessive force was used based on an "objective reasonableness" standard. *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (citing *Graham v.*

*Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The amount of force used will be objectively unreasonable if "judging from the totality of the circumstances ... the officer used greater force than was reasonably necessary." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (citations omitted). While mental illness may be relevant to the reasonableness inquiry, *Sallenger*, 473 F.3d at 739, it is also clear that law enforcement officers cannot "shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Importantly, all of the facts "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

When a defendant raises the defense of qualified immunity, a plaintiff must show: 1) that the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) that the constitutional right was clearly established at the time of the alleged violation. *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). In order to satisfy the second prong of this two-part test, a plaintiff may show "that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no

9

reasonable person could have believed that it would not violate clearly established rights.'" *Id.* (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001) and *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999)).

In the case before me, defendants were searching for a missing person, known to suffer from mental illness and believed to be suicidal. The woman who was the object of their search had committed no crime, nor was she suspected of engaging in any criminal activity. Defendants were aware that she was "known to carry razor blades in her socks," but the flyer given to defendants made no mention of a history of dangerous crimes. Deputy Kerstein testified that the protocol for a suicidal and missing person is to protect the person and to keep him from hurting himself. He further stated that if a deputy were to encounter a suicidal person possibly armed with a switchblade, he would talk to the person and continue to try to talk to the person until the person posed a threat to himself or others. The protocol described by Kerstein provides at least a starting point for considering what a reasonable officer would have done given the circumstances.

The parties disagree as to what prompted the Deputies to make physical contact with Knight. Defendants argue that Knight was yelling, swearing, flailing her limbs, and attempting to kick at least one of the Deputies. However, when the facts of this

10

case are taken in the light most favorable to her, Knight did not initiate any physical contact with any of the defendants, nor did she physically or verbally threaten them.  Knight, therefore, has raised a genuine dispute of a material fact precluding summary judgment on her claim that the amount of force used against her by Hakim and Asmussen was excessive.  Further, the questions of fact prevent summary judgment in favor of these two Deputies on grounds of qualified immunity.  Taken in the light most favorable to the plaintiff, the facts show that the defendants initiated physical contact with an unarmed woman whom they did not suspect of committing any crime and who had not provoked them.  They grabbed Knight's arms, caused her to fall by kicking or swiping her feet from under her, and then forced her to remain on the ground by manipulating her legs.

With regard to Knight's claim that defendants Kerstein, Naydenoff, and Asmussen failed to intervene to stop the excessive use of force, I find that this claim also involves disputed issues of fact that preclude summary judgment.  "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and*

11

the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). The Seventh Circuit has made clear that the prongs of this analysis almost always involve issues of fact for the jury. *Abdullahi*, 423 F.3d at 774 (citing *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)).

B. Count II – False Detention

The Deputies also argue that they are entitled to summary judgment on Knight's claim of false detention because there was no constitutional violation where defendants briefly detained plaintiff to ascertain her identity. Specifically, they argue, under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that they had a "reasonable suspicion" that Knight was in fact the missing suicidal woman who was the object of their search and therefore did not violate Knight's constitutional rights when they briefly detained her. In the alternative, defendants argue that they are entitled to qualified immunity.

The Fourth Amendment is not implicated or violated where communication between an officer and a citizen remains consensual. *Jones v. Clark*, 630 F.3d 677, 682 (7th Cir. 2011) (citing *Florida v. Bostick*, 501 U.S. 429, 433-34, 111 S.Ct. 2382,

12

115 L.Ed.2d 389 (1991)). "When an encounter shifts from consensual dialogue to an investigatory stop, the officer must be able to point to specific facts that give rise to a reasonable suspicion that the person stopped *is involved in criminal activity*." *Id.* at 682-683 (citing *Terry*, 392 U.S. at 30) (emphasis added). The Supreme Court has held that in the absence of reasonable suspicion of criminal conduct, applying a state statute to justify detaining an individual and requiring him to identify himself is unconstitutional. *Brown v. Texas*, 443 U.S. 47, 53, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In *Brown*, the Court found that officers infringed on the appellant's right to "personal security and privacy" under the Fourth Amendment when they detained him without "a reasonable suspicion that he was involved in criminal conduct" and "only ... to ascertain his identity." *Id.* at 52.

While defendants have argued that they had a "reasonable suspicion" to believe that Knight was in fact Unak-Murray, they have presented no facts or arguments suggesting that there was a "reasonable suspicion" that Knight was involved in any criminal conduct. The facts, taken in the light most favorable to plaintiff, suggest that the Deputies detained Knight only to ascertain her identity. Such a detention would constitute a violation of Knight's Fourth Amendment right to be free from unlawful seizure. Summary judgment is therefore precluded on

13

Count II.  Further, in light of well-established law requiring reasonable suspicion of criminal activity to justify detaining an unconsenting individual, defendants are not entitled to qualified immunity.

C. Punitive Damages

The parties agree that in the context of claims under § 1983, the standard for punitive damages is a high one.  "Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure."  *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009) (quoting *Hagge v. Bauer*, 827 F.2d , 101, 110 (7th Cir. 1987)).  Here, Knight has offered no evidence that any of the Deputies "acted with the malicious desire to cause [her] harm."  *Id.*  The only evidence Knight has submitted on defendants' motive is her subjective belief that defendants could not have mistaken her for Unak-Murray.  She has produced no evidence nor even suggested that the Deputies acted willfully or maliciously.  Knight's evidence cannot controvert the evidence presented by defendants, namely the "Missing Suicidal" flyer, which supports their claim that they reasonably believed Knight to be the missing person described in the flyer.  Knight, therefore, does not raise a genuine dispute of material fact on the issue of

punitive damages and I grant defendants' motion for summary judgment on the issue of punitive damages.

D.  Relation Back

Defendants have also moved for summary judgment on the basis that Knight's claims against Hakim and Asmussen are time barred. This motion is summarily denied, as defendants' argument and evidence cannot change my prior ruling on the issue. "[T]he question under [Federal Rule of Civil Procedure] 15(c)(1)(C)(ii) is what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant." *Krupski v. Costa Crociere S. p. A.*, 130 S.Ct. 2485, 2496, 177 L.Ed.2d 48 (2010). In my prior ruling, I found that relation back was appropriate because defendants Hakim and Asmussen did not claim that they did not know of this lawsuit. The affidavits submitted on summary judgment do not change or contradict this finding. Defendants' sworn affidavits state that they did not "know that [they] would or could be named as [] defendant[s] as a result of the occurrence involving plaintiff." Defendants do not, however, claim that they did not know of the lawsuit that was originally filed against Deputies Kerstein and Naydenoff. As I stated in my prior ruling, the misnaming of the original defendants was clearly a mistake. Hakim and Asmussen "reasonably should have

15

understood," based on their participation in the alleged constitutional tort as pled in the original complaint, that it was they and not only Kerstein and Naydenoff whom plaintiff intended to sue.

## III.

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Accordingly, summary judgment is granted as to plaintiff's claim for punitive damages and denied as to her substantive claims.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: October 18, 2011

16